# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| EMILIO MARTINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:08-CV-308-TLS |
| | ) | |
| WESTERN & SOUTHERN FINANCIAL | ) | |
| GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [ECF No. 54] filed by the Defendant, Western & Southern Financial Group, on July 27, 2011. The Defendant filed a Brief in Support [ECF No. 56] and an Appendix of Exhibits [ECF No. 55] with the Motion. On August 1, the Defendant filed a Supplemental Appendix [ECF No. 57] attaching one additional exhibit. The Plaintiff, Emilio Martino, filed a Memorandum in Opposition [ECF No. 58] to the Motion and an Appendix of Exhibits [ECF No. 59] on August 29. The Defendant filed a Reply [ECF No. 60] on September 15.

On June 6, 2008, the Plaintiff filed a Complaint [ECF No. 1] in St. Joseph County Superior Court. He then filed an Amended Complaint [ECF No. 2] on June 16. The Defendant removed the action to this Court on June 24, invoking federal question jurisdiction. On October 7, the Plaintiff filed a Second Amended Complaint [ECF No. 22]. The Defendant now seeks summary judgment on the Second Amended Complaint, which alleges two counts, one for defamation and one for violations of Title VII of the Civil Rights Act of 1964. Within the Title VII count, the Plaintiff alleges discrimination on the basis of religion and national origin, and retaliation against him for asserting rights under the statute.

## STANDARD OF REVIEW

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Id.* at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56-1(a) (stating that the movant must provide a "Statement of Material Facts" identifying the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); *see also* N.D. Ind. L.R. 56-1(b) (directing that a response in opposition to a motion for summary judgment "must include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary").

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view

all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A material fact must be outcome determinative under the governing law. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id*.

## STATEMENT OF FACTS

This statement of the facts presents—in a light most favorable to the Plaintiff—material undisputed facts as represented by the parties. This case arises out of an employment relationship between the Defendant and the Plaintiff lasting about two months. During that time period, two issues arose relevant to this suit. The Plaintiff did not provide the Defendant with documents establishing that he was authorized to work in accordance with U.S. immigration laws. The Defendant also told the Plaintiff that he must quit his outside position as a pastor in order to continue his employment with the Defendant, and the Plaintiff refused to do so. The Defendant asserts that it fired the Plaintiff because he failed to provide required I-9 documentation. The Plaintiff asserts that he was assured he would not be fired but rather placed on unpaid leave until he could produce the required documents and that the Defendant truly fired him for his refusal to quit his outside work as a pastor. The Plaintiff also asserts that non-religious outside positions were routinely approved under the same policy that the Defendant claimed did not permit his position, and that the Defendant gave another employee with missing I-9 documentation significantly more time to produce necessary documents. The Defendant sent a letter concerning

its termination of the Plaintiff's employment to the Indiana Department of Insurance. The Plaintiff asserts that this letter was defamatory or retaliatory. The Defendant asserts it was sent as a matter of standard company policy.

The Defendant is a financial services corporation with more than 4,000 employees and offices throughout the United States. The Defendant conducts sales operations out of many district offices including one in Mishawaka, Indiana (the Michiana Office).

The Plaintiff was born in Italy. He immigrated to the United States in 1963 and became a United States citizen in 1978. Prior to 2000, the Plaintiff had worked both in law enforcement as a police officer and in the financial services industry as an agent for John Hancock Financial Services. He has also worked continuously as the pastor of the First Baptist Church of Union in Union, Michigan, since May 2000.

In July 2006, the Plaintiff met Andrew Sobol, the District Sales Manager of the Defendant's Michiana Office. Sobol and the Plaintiff discussed a job opportunity with the Defendant. The Plaintiff told Sobol he worked as a pastor. Sobol suggested that he take certain courses preparing him for a job opportunity with the Defendant and then apply for a job, which he did. The Defendant offered him a job in August 2006. The Plaintiff filled out and signed an application for this position on August 14, 2006. He began working in the Michiana Office as a Sales Representative on September 4, 2006.

Shortly after beginning his work for the Defendant, the Plaintiff signed a Sales Representative's Agreement. The Agreement stated that the Plaintiff agreed: "Not to commence any action or suit relating to [his] employment with [the Defendant] more than six months after the date of termination of such employment, and to waive any statute of limitations to the

contrary." (Pl.'s Dep. Ex. 17 ¶ III.C, ECF No. 55-6 at 46.) The Agreement further stated that the

Plaintiff agreed: "Not to commence any action or suit against [the Defendant] by reason of its

having furnished information to any regulatory agency, prospective employer or person regarding

[his] record as a Sale Representative, [his] actions while a Sales Representative or the reason for

termination of [his] employment." (*Id*. III.D.)

During the Plaintiff's employment, the Plaintiff, Sobol, and Erin Miller, a Human

Resource Generalist for the Defendant, exchanged a series of emails concerning the Plaintiff's

position as a pastor. Employees of the Defendant who held outside positions were required to fill

out a form to seek approval of the outside position. Miller was responsible for reviewing these

forms and presenting the requests for approval during a weekly departmental meeting. Miller

testified that she did not identify employees by name when presenting these requests.

Soon after beginning his employment, the Plaintiff submitted the required form disclosing

his position as a pastor, but did not indicate his regular hours or compensation. Miller emailed

the Plaintiff on September 18 requesting information on the average hours worked per week

(excluding Sunday) and average weekly pay for the position. On September 26, Miller emailed

the Plaintiff again indicating that the Plaintiff had not responded to her request for information

and that failure to respond by the next Friday, September 29, would "result in denial of [his]

position." (Pl.'s Aff. Ex. 4, ECF No. 59-1 at 14.) Later, still on September 26, the Plaintiff

responded that he worked 8 to 10 hours per week with no set days other than Sunday at an

average weekly pay of $300. On September 27, Miller emailed the Plaintiff informing him that

based "on the information provided, [his] personal business venture [did] not comply with [the

Defendant's] outside positions policy." (*Id*., ECF No. 59-1 at 15.) She quoted the Defendant's

outside positions policy in the email: "you agree to devote your entire working time to the service, success and welfare of" the Defendant. (*Id.*) She further instructed the Plaintiff to "terminate this outside business venture immediately." (*Id.*)

At this point, also on September 27, Sobol entered the conversation by emailing Miller. (Pl.'s Aff. Ex. 4, ECF No. 59-1 at 16.) Sobol stated that the Plaintiff's position was "not a personal business venture"; rather, it was "community service work." (*Id.* (capitalization altered).) Sobol stated that he had "always thought that [the Defendant] was big on community service work and wanted [its] agents to give back to the communities from which we make our livings." (*Id.* (capitalization altered).) Sobol continued: "Being a pastor at a small congregation is the epitome of public service and community involvement. So, I'm confused, maybe community service work is forbidden now, can you please clarify the company's policy on this, so I don't make this mistake in the future." (*Id.* (capitalization altered).) Miller responded to Sobol, again on the same day: "This situation is a little different because of the amount of time and money involved." (*Id.*)

Sobol then responded to Miller, on September 28, that the Plaintiff was "reluctant to give up his position as pastor." (Pl.'s Aff. Ex. 4, ECF No. 59-1 at 17 (capitalization altered).) Sobol indicated that he had spoken with the Plaintiff and believed that the Plaintiff had "inflated the [number] of hours per week that this position requires" as it really only required about one to two hours per week excepting Sundays. (*Id.* (capitalization altered).) Sobol also said he believed the Plaintiff would be willing to continue his role as pastor without pay but that the Plaintiff would "like to make as much money at it, as we would allow." (*Id.* (capitalization altered).) Sobol wrote: "[I]s there a standard amount of income that we will allow a person to make in a public

service outside position, and if so, what is that amount? Or, is there no standard and it is determined on a case by case basis. Please advise!" (*Id.* (capitalization altered).) Miller's entire response, sent September 29, was "Andrew [Sobol] this position is being denied due to consistent past practices regarding outside positions." (*Id.*) Sobol responded, also on September 29, "It would help me in my future recruiting efforts to know if we will allow someone to ever hold a public service position" because Miller's "implication" was that such positions were not allowed when prior stated company policy indicated that they were. (*Id.*, ECF No. 59-1 at 18.) Sobol asked: "Are you saying that the policy has now changed, because if so the field MGMT. needs to know." (*Id.*) Miller responded the same day: "No the policy has not changed, [the Plaintiff's] outside position does not fit into our policy due to [past] practices. Paid public service positions are subject to approval by [Field Human Resources] as stated in the policy." (*Id.*)

On October 4, the Plaintiff responded to Miller's email of September 27 informing him that his outside position did not comply with the policy. The Plaintiff wrote:

> It has become evident from your decision via email on Sept. 27 telling me to terminate this 'outside business venture' immediately that I need to address this situation. It has also become very evident from your email conversations with my District Manager Mr. Sobol, that you have no intention of approving my public service position, which with God's blessings I will continue to serve in, as pastor of a small community church. Is the company denying my public service position and terminating my agent appointment with [the Defendant]? Please be specific so I will know what my position is with the company. Thank you.

(Pl.'s Aff. Ex. 4, ECF No. 59-1 at 19.) The same day Miller responded: "Your position with [the Defendant] is not being terminated. We are asking that you terminate your public service position because, from the information you provided, it does not comply with our policy." (*Id.*) Miller copied Tarah Corlett, Human Resource Manager, on this email. (*Id.*)

Just after he began his employment, the Defendant sought verification of the Plaintiff's employment eligibility through use of the I-9 form required by 8 U.S.C. § 1324A(b)(I). The Plaintiff was unable to locate his Social Security card and did not provide any other document meeting the form's requirements. Maxine Edwards, District Administrator for the Michiana Office, noted on the Plaintiff's I-9 form that the Plaintiff was seeking a replacement Social Security card because he could not find his card. Edwards and Sobol spoke with the Plaintiff several times between September 5 and October 16, 2006, about the documentation required by the I-9 form. During that time period he twice sought a replacement card from the Social Security Administration (SSA). Rather than a duplicate card, the SSA provided him first with a document dated September 9, 2006, which he provided to the Defendant, verifying his Social Security number but also stating that the document did "not verify [his] right to work in the United States." (Pl's Dep. Ex. 19, ECF No. 55-7 at 3.) Next, the Plaintiff received a document from the SSA, dated October 6, 2006, indicating that the SSA could not issue him a card on that date because it was awaiting documentation from the Department of Homeland Security. (*Id*. Ex. 20, ECF No. 55-7 at 4.) The Plaintiff understood that the documents he received from the SSA and various other documents he brought in were not sufficient to meet the I-9 form's requirements. (*Id*. 235–39, ECF No. 55-5.) The Plaintiff sought verification of his naturalization from the Department of Homeland Security as required by the SSA for receiving a new card; he learned this process would take 30 to 45 days and informed the Defendant. (*Id*. 239–43, ECF No. 55.)

A letter dated October 9, 2006, signed by Corlett and addressed to the Plaintiff, indicated that the Plaintiff had failed to provide documentation verifying his employment eligibility. The letter stated: "your inability to provide acceptable documentation will result in placing you on an

unpaid suspension from work until this matter is resolved. . . . we are providing you with five (5) business days to submit this required information to our Home Office." (Oct. 9, 2006, Letter, ECF No. 59-6.) This letter instructed the Plaintiff to "have the required documentation faxed to [XXX-XXX-XXXX] with a copy of this letter no later than the close of business on October 13th." (*Id*.) The Defendant then sent a letter to the Plaintiff, dated October 16, 2006, signed by Thomas Johnson, Director of Field Human Resources. This letter stated: "Field Human Resources sent you a letter on October 9, 2006 requesting you send documentation for employment eligibility purposes by October 13, 2006. To date no documentation has been received. As such, your employment is terminated effective October 16, 2006." (Oct. 16, 2006, Letter, ECF No. 59-7.)

On October 23, the Defendant sent a letter to the Indiana Department of Insurance indicating that the Plaintiff no longer worked for the Defendant. (Oct. 23, 2006, Letter, ECF No. 59-17.) On November 6, 2006, the Indiana Department of Insurance sent the Plaintiff a letter. This letter indicated that the Department received a complaint against the Plaintiff and that the Department would like to resolve the issue without an administrative action against his insurance license. (Nov. 6, 2006, Letter, ECF No. 59-19.) The letter stated that a complaint against the Plaintiff was attached, but the attached complaint does not appear in the record.[1] The letter also required the Plaintiff to submit a list of all companies with which he had held appointments in the previous twelve months or face suspension of his license. (*Id*.) The Plaintiff responded to the letter and the Department closed the investigation. (Pl.'s Dep. 259–60, ECF No. 55-5.)

---

[1] The Defendant submits the same letter into evidence—also without any attachments. (Pl.'s Dep. Ex. 33, ECF No. 55-8 at 42.)

## ANALYSIS

The Defendant argues that the Court should dismiss all of the Plaintiff's claims as barred by the six-month contractual limitation period contained in the agreement he signed upon commencement of his employment. The Plaintiff argues that he did bring his claims within the six-month period or that, in the alternative, the contract is unenforceable as made without consideration or as against public policy. The Defendant also argues that the Plaintiff cannot sue for retaliation because he did not raise retaliation as a claim before the Equal Employment Opportunity Commission. Because the Court will grant summary judgment to the Defendant, for the reasons stated below, it will not reach these procedural arguments raised by the Defendant.

### A.      Religious Discrimination

Title VII makes it unlawful for an employer to discharge or discipline an employee because of that person's religion. 42 U.S.C. § 2000e–2(a)(1). An employee may prove discrimination under Title VII either directly, or, indirectly under the burden-shifting method, as articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Silverman v. Bd. of Educ. of City of Chi.,* 637 F.3d 729, 733 (7th Cir. 2011). "Title VII requires accommodation of religious practices, when that can be accomplished without undue hardship." *Flowers v. Columbia Coll. Chi.*, 397 F.3d 532, 534 (7th Cir. 2005) (citing 42 U.S.C. § 2000e(j)).

Under the direct method, a plaintiff must "present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708

(7th Cir. 2011). Under the indirect method, a plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case of discrimination, a plaintiff must offer evidence that: "(1) he is a member of a protected class; (2) he was qualified for the applicable positions; (3) he suffered an adverse employment action; and (4) similarly-situated persons not in the protected class were treated more favorably." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (citing *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007)).[2] However, when an employer presents a legitimate, nondiscriminatory basis for the adverse employment action the burden returns to the plaintiff and the burden shifting of the *prima facie* is no longer relevant. *See Brewer v. Bd. of Tr. of the Univ. of Ill.*, 479 F.3d 908, 915–16 (7th Cir. 2007) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)); *see also Larson v. Portage Tp. School Corp.*, 293 Fed. Appx. 415, 418–19 (7th Cir. 2008) ("[W]here an employer offers a legitimate, nondiscriminatory reason for firing an employee, it simply 'doesn't matter' whether the plaintiff presented a prima facie

---

[2] A plaintiff can also establish a *prima facie* case of religious discrimination by showing "that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997). "[O]nce the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any accommodation would result in undue hardship." *Id.* The Plaintiff here, however, does not appear to argue his case under the theory that the Defendant refused to provide a reasonable accommodation. Rather, the Plaintiff makes his primary argument concerning reasonable accommodation in his brief in a section entitled "[The Plaintiff] engaged in protected activity" in which he argues that he "did engage in protected activity when he opposed the unlawful employment practice of failing to accommodate [the] Plaintiff's status as a pastor." (Pl.'s Mem. Opp'n Summ. J. 20.) The Court reads this argument to support his claim of retaliation because engaging in "protected activity" is an element of the *prima facie* case for retaliatory discrimination, and not for religious discrimination itself. In any case, the distinction between making a *prima facie* case that he was refused a reasonable accommodation for a religious practice or was fired because of his religion or religious beliefs is not relevant here because the Court will focus its analysis on whether the Plaintiff successfully calls into question the Defendant's stated reason for his firing.

case of discrimination.") (quoting *Brewer*, 479 F.3d at 915–16); *Spector v. U.S. Bank Nat'l Ass'n*, 286 Fed. Appx. 333, 335 (7th Cir. 2008) ("Both the district court and the parties' briefs analyze whether [the plaintiff] made a *prima facie* case of sex discrimination. Often, however, when an employer offers a legitimate, nondiscriminatory reason for firing an employee, it is just as easy to evaluate the case as a whole to see if the plaintiff has presented enough to survive summary judgment.") (citing *Brewer,* 479 F.3d at 915–16). After "an employer offers a legitimate, nondiscriminatory reason for firing an employee . . . [t]he inquiry turns to whether the plaintiff has created a genuine issue of fact about the sincerity of that explanation and therefore whether the defendant discriminated against her." *Id*. (citing *Hicks*, 509 U.S. at 511; *Hague v. Thompson Distrib. Co.*, 36 F.3d 816, 823 (7th Cir. 2006)). The Seventh Circuit has also noted that "[w]here a plaintiff claims . . . that an employer's legitimate expectations were disparately applied, the second and fourth elements of the *prima facie* case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008); *see also Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010) ("In some cases . . . the issue of satisfactory performance and the question of pretext overlap" because '[w]hen the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's prima facie case and the pretext analysis."); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) ("As we have pointed out on several occasions, this issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext.")

In this case, the Defendant offered a legitimate, non-discriminatory reason for firing the Plaintiff. The Plaintiff, for his part, does not clearly articulate in his brief the elements of his *prima facie* case. For example, he does not explicitly state how the similarly-situated individuals on which he relies fall outside his class, or even exactly what protected class he falls in. Nevertheless, the Plaintiff presented evidence attempting to call the Defendant's asserted basis for the firing into question. The Court will not, therefore, analyze whether he has successfully made out a *prima facie* case. Instead, the Court will review the evidence and legal arguments the Plaintiff has presented to determine whether he has submitted evidence upon which a reasonable jury could find that the Defendant's stated reason for terminating his employment was pretextual and his firing was motivated in some way by his religion or religious practices or beliefs. The Plaintiff attempts to show that discriminatory animus motivated the decision and that the Defendant's claimed basis for the firing is pretext in four ways: 1) other individuals received approval for non-religious outside positions under the same policy including at least one individual who made more money than the Defendant states was allowed under the policy; 2) the same group of employees involved in both the I-9 issue and his request for approval of his pastoral position "did not want to accommodate" his position as a pastor (Pl.'s Mem. Opp'n Summ. J. 4); 3) the same group of employees treated a similarly-situated employee better with regard to producing employment eligibility documents; and 4) the Defendant first told the Plaintiff he would be placed on unpaid leave until he could produce the required documentation and then fired him instead.[3]

---

[3] The Court categorizes the Plaintiff's material contentions here for convenience of analysis. In doing so, the Court considered all of the arguments presented in the Plaintiff's brief on this issue, including all of the relevant statements of genuine disputes provided pursuant to Local Rule 56-1.

The Plaintiff presents evidence that Defendant approved other employees' s non-religious positions under the same policy that the Defendant stated did not permit his position as a pastor, and that at least one such individual earned more money and worked more hours than the Defendant asserts the policy permits. This evidence includes an affidavit from an employee in the Michiana Office stating that another employee of that office regularly missed half a day per week to serve as a music instructor at Indiana University South Bend and the personnel file from the university indicating that the employee worked there in that capacity. The Plaintiff also submitted a letter the Defendant provided to the EEOC listing other positions approved by the Defendant, all of which were for non-religious employment. That letter states that the Defendant's criteria for approval under the policy only allowed positions making less than $101 per week and working fewer than six hours per week excluding Sundays. The Defendant continues to assert that this is its policy. The personnel file for the individual who worked as a music instructor appears to indicate that he made more than $100 per week in his outside position, but his outside position request form provides that he would make $80 per week. The Defendant asserts that it did not know he was making more than the allowed amount or working more than the permitted hours. The emails between Sobol and Miller at the time the Plaintiff requested approval contradict the Defendant's assertion that it consistently and clearly applied its policy, as Sobol twice requested a clear statement of the policy and it was not provided to him or the Plaintiff. Sobol also indicated that the Plaintiff would work as a pastor for free or reduce his pay, and Miller refused to respond to those offers.

Viewing the evidence in the light most favorable to the Plaintiff and making several inferences in his favor, he may have created an issue of material fact regarding whether the denial

of his outside position request was based on, or constituted some evidence of, bias against his religion or religious practices on the part of the Defendant. However, the Plaintiff has failed to show how any unfairness or bias in the denial of his outside position, or vengeance against him for refusing to quit that position, resulted in an adverse employment action. "[B]igotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). The Plaintiff has not presented evidence from which a reasonable jury could infer that bias with respect to his outside religious position infected the decision to terminate him on the basis of his failure to produce employment eligibility verification or that the Defendant did not fire him for its stated reason.[4]

The Plaintiff argues that Johnson was "at the center of the core group of decision makers" who oversaw both the I-9 and outside position request issues. (Pl.'s Mem. Opp'n Summ. J. 2, ECF No. 58.) The Defendant describes the final process leading to the Plaintiff's termination as follows. Corlett received approval from Johnson to send a letter to the Plaintiff giving him five

---

[4] The Plaintiff cites *Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 372, 380 (7th Cir. 2011), for the proposition that "the Seventh Circuit approves the 'cat's paw' theory of liability, in which a biased employee's influence over a decision can infect the decision." (Pl.'s Mem. Opp'n Summ. J. 15.)

> In employment discrimination cases, the "cat's paw" is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias. With sufficient evidence, we permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision.

*Schandelmeier-Bartels,* 634 F.3d at 380. When a plaintiff relies on the cat's paw theory he must at least put forward evidence that the "biased voice mattered" and that, regardless of who had nominal decision making power, an employee with bias against the plaintiff had "decisive input in the decision." *Id.* at 381. Although the Plaintiff uses the language "cat's paw" and attempts to lump together those involved in the decision making regarding his I-9 form and his outside position request, he has not presented evidence showing how Miller had decisive input into the decision to fire the Plaintiff. The Plaintiff has not shown how any bias that could be inferred from the treatment of his outside position request or from Corlett's knowledge of that request infected the decision making concerning his I-9 issue.

days to provide I-9 documentation. After the five days to provide the documentation passed Cortlet "explained the situation to . . . Johnson, and then took the issue to Divisional Vice President Bill Skidmore." (Corlett Aff. ¶ 18, ECF No. 55-11.) Skidmore had ultimate authority to fire the Plaintiff based on recommendations from the Field Human Resource Department. (Skidmore Aff. ¶ 8, ECF No. 55-1.) Skidmore stated that he had no information concerning the Defendant's request for an outside position or his religion at the time he made the decision to fire the Plaintiff. (*Id.* ¶ 9.) Based on Skidmore's decision, Johnson signed and sent the letter terminating the Plaintiff's employment. (Johnson Aff. ¶ 9, ECF No. 55-10.) The Court accepts, based on the letter signed by Johnson and his supervisory position over Corlett, that a jury could conclude that Johnson, not Skidmore as asserted by the Defendant, made the decision to fire him.

Johnson, however, also testified that he based his decision and recommendations concerning the Plaintiff's employment on the Plaintiff's failure to provide required I-9 documentation. He further testified that, at the time he made this decision, or recommendation, he knew nothing about the Plaintiff's religion or his request for approval of an outside position. Johnson testified in his deposition:

> Q: Were you involved at all in the outside position issue? A: No. I wasn't familiar with [the Plaintiff] having an outside position. As I said, in our Wednesday meeting, as a rule we didn't discuss who these people were. It's just here's the details around the position. Does it fit our criteria, not fit our criteria. Q: Do you remember anything that was mentioned that you associated with [the Plaintiff] relative to the outside position? A: No.

(Johnson Dep. 110, ECF No. 55-18.) His testimony was consistent with Miller's affidavit with regard to an anonymity policy when discussing outside position requests. (Miller Aff. ¶5, ECF

No. 55-14.)[5] The Plaintiff attempts to create an issue of material fact with regard to Johnson's knowledge of the Plaintiff's religion and outside position request. He argues that "Johnson [had] ultimate authority to approve any requested outside position after conversation" with Corlett, Miller, and others and that "Corlett kept Johnson apprised of developments relating to [the Plaintiff]." (Pl.'s Mem. Opp'n Summ. J. 6, ECF No. 58 (citing Def.'s Ans. to Interrogatory No. 10, ECF No. 58-4).) The Plaintiff also argued, without citation to the record, that Johnson would be aware of the Plaintiff's "stand on religion" because he "worked closely" with Corlett and Miller. (*Id.* 20.) However, the document relied on by the Plaintiff to support his contention that Corlett informed Johnson of the Plaintiff's outside position request indicates, in keeping with Johnson's testimony, that Corlett kept Johnson apprised of efforts to obtain employment eligibility verification and does not contradict Johnson's statements that he was unaware of the Plaintiff's outside position request. The Plaintiff also points out that several relevant individuals worked in the same building and that Corlett and Miller worked under Johnson's supervision. These facts do not materially contradict Johnson's testimony regarding his lack of knowledge of the Plaintiff's religion or his outside position request or support an inference that his statements are untrue. Accordingly, the Court finds that the Plaintiff fails to create an issue of material fact for trial with regard to Johnson's knowledge of developments concerning the Plaintiff's request for approval for his position as a pastor.

---

[5] That Miller copied Corlett, another member of the Field Human Resource Department, on one of the emails sent to the Plaintiff concerning his outside position contradicts her statement that "typically, no one in the Field Human Resource Department, other than me, knew the name of (or any other information about) the associate requesting the approval." (Miller Aff. ¶ 5, ECF No. 55-14.) The Plaintiff does not raise this fact as an indication that Miller is lying about the policy and Corlett's knowledge does not contradict Johnson's testimony that he never learned of the Plaintiff's request.

The Plaintiff also presents evidence describing the case of another employee who he argues the Defendant treated more favorably than he with regard to the submission of I-9 documents. The parties present extensive factual disputes about the verification of employment eligibility for that individual, Michael Bacon. According to the Plaintiff, Bacon worked for the Defendant for several years without legal authorization after a temporary work visa expired. By July 13, 2006, Johnson was aware that the Defendant was seeking verification from Bacon of his employment eligibility. Yet, it was not until August 14, 2006, that Johnson finally emailed the Defendant and gave him a fixed amount of time, until August 18, 2006, to provide the required documents or he would "make the necessary employment decisions with the information currently at hand." (Aug. 14, 2006, Email Exchange, ECF No. 59-18 at 2.) The Plaintiff argues that he was not given as much time to produce documents as Bacon and that Johnson did not ultimately terminate Bacon as he did the Plaintiff. Rather, the Defendant allowed Bacon to resign, while the Plaintiff was not given that opportunity. Further, Bacon testified that he lied to the Defendant to draw out the process of verification of his employment eligibility.[6]

"[E]vidence that similarly situated employees outside [a plaintiff's] protected classes received more favorable treatment from the same decision-maker . . . [such as] evidence of selective enforcement of a rule 'calls into question the veracity of the employer's explanation.'" *Coleman v. Donahoe*, — F.3d —, 2012 WL 32062, at \*16 (7th Cir. 2012) (quoting *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001)). "A similarly situated employee is one who is directly comparable to the plaintiff in all material aspects. Factors to consider include

---

[6] Bacon stated in an affidavit that, in July and August 2006, he lied about his authorization to work in the United States in order "to delay [the Defendant] while [he] worked with an immigration lawyer to obtain work authorization." (Bacon Aff. ¶ 6, ECF No. 55-15.)

whether the employees 1) had the same job description, 2) were subject to the same standards, 3) were subject to the same supervisor, and 4) had comparable experience, education, and other qualifications." *Salas v. Wis. Dept. of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007) (citations and quotation marks omitted).

Although there might be an issue of material fact with regard to whether Bacon was treated more favorably, the Plaintiff failed to submit evidence creating an issue of material fact that he and Bacon were similarly situated and, thereby, failed to provide evidence that a rational finder of fact could rely on in determining that evidence of the Defendant's treatment of Bacon casts doubt on the Defendant's explanation of its treatment of the Plaintiff.[7] Taking into account the Seventh Circuit's statement that comparable experience and qualifications are factors to be considered on the question of whether two employees are similarly situated, the Plaintiff and Bacon were not similarly situated. Bacon had worked for the Defendant for several years while the Plaintiff was recently hired, so Bacon's comparable experience and qualifications were obviously different. Further, a different group of individuals, though one also including Johnson, made the decision concerning Bacon's employment eligibility verification. Corlett states that she had no involvement in Bacon's I-9 process because he worked in a division of the Defendant that she did work with. (Corlett Aff. ¶ 26.) The Plaintiff attempts to controvert her statement by

---

[7] The Plaintiff provided no evidence that Bacon was outside his class. To the contrary, the Defendant submits an affidavit from Bacon in which he testifies that he is also Christian. (Bacon, Supp. Aff. ¶2, ECF No. 60-1.) The Court would, however, permit an inference in this case that the Plaintiff's religion and religious beliefs were nevertheless different enough to place them in different classes. *See Andrews v. Virginia Union Univ.*, 2007 WL 4143080, at *5 (E.D. Va. Nov. 19, 2007) ("An individual's religion is a product of that individual's conscience, and the sincerely held religious beliefs and practices of individuals who ascribe to the same denomination may be markedly different; the religious practices of one Baptist may be quite unlike another.").

indicating she testified, in her deposition, that she knew about Bacon's case and that Johnson testified that Corlett made inquires into and was copied on emails relating to Bacon's case. That Corlett knew that an open issued existed and sought and received information concerning Bacon's I-9 documentation does not controvert her statement both in her affidavit and her deposition that she did not take part in his case as a decision maker. (Corlett Dep. 9–1, ECF No. 59-13.)

The Defendant argues that Keith Payne, the Divisional Vice President for Division B, took a more assertive role in Bacon's case than Skidmore did in the Plaintiff's case and provides statements from Johnson and Payne supporting those assertions. (Johnson Aff. ¶ 17, ECF No. 55-10; Payne Aff. ¶ 5, ECF No. 57-1.) Payne stated that he had a good working relationship with Bacon and that he "took the lead" in Bacon's re-verification issue. (Payne Aff. ¶ 5.) Payne also states that he was not involved in the Plaintiff's employment verification. (*Id*. ¶ 11.) The Plaintiff has not controverted this evidence. The Plaintiff and Bacon were not similarly situated. A straightforward inference could be drawn that Bacon received more favorable treatment because he had been at the firm longer and developed better connections than the Plaintiff, or that he was better positioned within the firm to drag the process out. Unlike the Plaintiff, Bacon testified that he intended to delay the process of his I-9 verification, further supporting the Defendant's contention that the two were not similarly situated. There is no reasonable inference to be drawn that because Bacon received more time to come into compliance and left on his own terms, the Defendant's explanation that it fired the Plaintiff for failing to provide necessary documentation is untrue.

Furthermore, the Plaintiff did not submit evidence indicating that the Defendant was

generally out of compliance with regard to I-9 and sought to verify only his employment eligibility. *See Coleman*, 2012 WL 32062, at *16 ("The plaintiff's 'showing that the company did not enforce such a policy' is evidence from which the 'jury . . . could rationally conclude that the legitimate non-retaliatory reason offered by [the employer] was a pretext for discharging [the plaintiff].'") (quoting *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 202 (3d Cir. 1996)). Rather, he argues that the Defendant did not provide consistent evidence regarding the policy and gave some employees more time than others. Johnson stated that the policy was to give only two or three days to correct I-9 issues and also stated that the Defendant would sometimes give more time. Corlett testified that the policy was to give three business days to produce acceptable documents followed by a five-day unpaid suspension. The Plaintiff himself received nearly six weeks to produce his documentation, therefore, to the extent he presented evidence that the company failed to enforce a consistent policy on the time provided for requiring I-9 documents, he has only argued that he was treated more favorably than some other employees of the Defendant. Indeed, the Plaintiff's testimony that the Defendant sought I-9 documentation from him his first week on the job and continued to follow up with him when the documents he provided did not appear sufficient supports the Defendant's contention that it actively sought to stay in compliance with its obligation to verify the employment eligibility of its employees. Similarly, the emails submitted by the Plaintiff to support his argument that Bacon received more favorable treatment repeatedly demonstrate the Defendant's concern with staying in compliance on I-9 issues, even if they also demonstrate some degree of inefficiency or incompetency in enforcing the rules as to Bacon. The undisputed evidence is that the Defendant sought employment eligibility verification from the Plaintiff, Bacon, and all other employees. The

evidence relied on by the Plaintiff fails to call into question the Defendant's stated rationale for firing the Plaintiff.

The Plaintiff also argues that statements indicating that he would be placed on unpaid leave until he could produce his I-9 documents rather than be fired establish pretext. Again, the Plaintiff has not provided evidence that the Defendant had a policy of placing individuals who could not provide employment eligibility documentation on unpaid leave until they could produce this documentation. The Plaintiff relies on the letter sent to him by Corlett placing him on unpaid suspension from work on October 9, 2006. The letter stated: "your inability to provide acceptable documentation will result in placing you on an unpaid suspension from work until this matter is resolved. . . . we are providing you with five (5) business days to submit this required information to our Home Office." (Oct. 9, 2006, Letter, ECF No. 59-6.) The Plaintiff's reading of this language is strained as he argues "it leaves a very clear impression that [the Plaintiff] would be suspended until he resolved the I-9 issue." (Pl.'s Mem. Opp'n Summ. J.) The letter, in the context of repeated requests by the Defendant for I-9 documentation from the Plaintiff, at the very least leaves open the possibility that he would be fired at the end of the five-day period provided for submitting his documents. The letter does not indicate or even suggest that the Defendant's decision to fire him for failure to produce those documents was untrue, or otherwise support his claims.

The Plaintiff has not submitted evidence sufficient to allow a reasonable trier of fact to conclude that the Defendant's explanation for firing him is untrue or that he was discriminated against. Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's claim of religious discrimination under Title VII.

**B.      Retaliation**

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). When asserting a charge of retaliation under Title VII, a plaintiff may proceed under the direct or indirect method of proof. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method of proving retaliation, a plaintiff must present either direct or circumstantial evidence showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action taken by the employer; and (3) a causal connection exists between the protected activity and the adverse action. *Id*. Under the indirect, burden-shifting method, the plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered a materially adverse action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected expression. *Id.*

Statutorily protected activity can include informal, internal complaints. *Davis v. Time Warner Cable of Se. Wis., L.P*. 651 F.3d 664, 674 (7th Cir. 2011). However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Although an employee need not use . . . magic words . . . she has to at least say something to indicate her [protected status] is an issue. An employee can honestly believe she is the object of discrimination, but if

she never mentions it, a claim of retaliation is not implicated." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quotation marks omitted).

The email sent by the Plaintiff to Miller stating that he would "with God's blessings . . . continue to serve . . . as pastor of a small community church" does not constitute protected activity under the statute because it does not indicate that the Plaintiff believes he is being discriminated against on the basis of religion. (Pl.'s Aff. Ex. 4, ECF No. 59-1 at 19.) The Plaintiff argues that the email was protected activity because in it the Plaintiff objected to an allegedly unlawful employment practice, namely the Defendant's unwillingness to make what he asserts would have been a reasonable accommodation for the Plaintiff's religious practices. (Pl.'s Mem. Opp'n Summ. J. 20.) However, the Plaintiff made no such assertion in the email itself. The Plaintiff stated in the email that he wanted to continue serving as pastor of his church, implied that he was willing to quit his job with the Defendant to do so, and requested final clarification on the Defendant's position. Nothing in the email states or implies that there is anything unlawful or discriminatory about the Defendant's policy even if the tenor of the email indicates that the Plaintiff finds the policy objectionable. The Plaintiff's email makes no explicit mention of his religious convictions or of any alleged anti-Christian or anti-religious animus, bias, or discrimination of any kind. *See Davis,* 651 F.3d 664 at 674 (finding that a plaintiff's accusing his supervisor "of being 'unfair' and treating his white subordinates more favorably than his African American ones" could established protected activity under the statute); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (finding that the statement "[a]ren't you being discriminatory?" could establish protected activity under similar statutory provision of the Americans with Disability Act). The Plaintiff's claim of retaliation fails as a matter of law

24

because he did not submit evidence that he engaged in statutorily protected activity, a necessary requirement to support a claim of retaliation under the statute. Further, even if the Plaintiff could prove that he undertook statutorily protected activity, his claim would still fail because he did not submit evidence supporting a causal connection between the activity he took and the negative employment action (under the direct method) or showing that similarly-situated employees who did not engage in statutorily protected activity were treated better (under the indirect method).

C.      **Defamation**

To prove defamation in Indiana, a plaintiff must show that the defendant made a communication with four elements: "1) defamatory imputation; 2) malice; 3) publication; and 4) damages." *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 261 (Ind. 1994).

> One type of defamation action, alleging defamation *per se*, arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct. In contrast, if the words used are not defamatory in themselves, but become so only when understood in the context of extrinsic evidence, they are considered defamatory *per quod*.

*Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) (citations omitted). In an action for defamation *per se*, damages are presumed. *Kelley v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007). "In an action for defamation *per quod*, the plaintiff must demonstrate special damages." *Id*. "Any statement actionable for defamation must not only be defamatory in nature, but [also] false." *Trail v. Boys & Girls Clubs of Nw. Ind*., 845 N.E.2d 130, 136 (Ind. 2006).

The Plaintiff argues the letter sent by the Defendant constituted defamation *per se* because it implied that he had "committed a criminal act, or had otherwise done something

improper as a licensed insurance agent, triggering the notice to the department." (Pl.'s Mem. Opp'n Summ. J. 22, ECF No. 58.) The letter raises no imputation of criminal conduct or professional misconduct on its face. The letter states that the Plaintiff "no longer represents" the Defendant and "is no longer" in the Defendant's employment. (Oct. 23, 2006, Letter, ECF No. 59-17.) The letter indicates that the Defendant attached the letter it sent to the Plaintiff upon his termination, which indicated the reasons for termination. It appears that this attachment was the same letter Johnson sent to the Plaintiff on October 16, 2006. This letter also does not, on its face, impute criminal conduct or professional misconduct, rather it states only that the Plaintiff failed to provide "documentation for employment eligibility purposes" by the date required by the Defendant. (Oct. 16, 2006, Letter, ECF No. 59-7.)[8] Furthermore, the statement in this letter closest to impugning the Plaintiff's reputation, that he failed to provide necessary documentation, was true. The Plaintiff has failed to submit evidence supporting a claim for defamation *per se*.

With regard to defamation *per quod*, while the Plaintiff established publication and may have created a material issue of fact with regard to defamatory imputation, he has failed to support either malice or damages. Concerning malice, the Defendant submits an affidavit from Brenda Feige, who sent the letter, testifying that she had no knowledge of the Plaintiff's religion or his refusal to resign his position as pastor, but rather sent the letter to the Department as a matter of routine company policy. The Court finds no malice on the part of Feige as the Plaintiff points the Court to no evidence contradicting her affidavit.

---

[8] The Plaintiff argues that the imputation of professional misconduct is premised on the statutory requirement contained in Indiana Code § 27-1-15.6-15. This statute only requires notification to the Indiana Department of Insurance of the termination of an insurance agent where the agent violated certain rules. Such extrinsic information falls outside the definition of defamation *per se*.

The Plaintiff argues that Johnson "knew [the letter] would be sent and did nothing to stop it" and that "malice certainly can be inferred from the circumstances." (Pl.'s Mem. Opp'n Summ. J. 23.) The Plaintiff argues Johnson could have included less information in his letter that was ultimately forwarded to the Department by Feige. However, the mere fact that the Johnson knew either letter (his initial letter terminating the Defendant or Feige's letter) would be sent to the Department does not provide evidence of malice towards the Plaintiff—particularly where Johnson testified that he was never aware of the Plaintiff's religion or his request for approval of his outside pastoral position. Johnson presents evidence that he acted without malice towards the Plaintiff. The Plaintiff has not submitted evidence contradicting that testimony.

The Plaintiff has also failed to provide evidence of special damages. The Plaintiff's focus in his brief on arguing for defamation *per se* appears to concede this point. He argues only that he "suffered humiliation and embarrassment as a result of having to defend his license to the Indiana Insurance Commissioner based on a report that never should have been made." (*Id*. 22.) Such emotional harm does not constitute special damages and is insufficient to support a claim of defamation *per quod*. *Lovings v. Thomas*, 805 N.E.2d 442, 448 (Ind. Ct. App. 2004) ("Emotional and physical harms are not special damages unto themselves, but rather are parasitic damages, viable only when attached to normal (i.e., pecuniary) special damages.").

The Court will grant summary judgment in favor of the Defendant on the Plaintiff's claims of defamation because the Plaintiff has failed to provide evidence supporting a claim of defamation *per se* or *per quod*.[9]

---

[9] The Defendant also presents persuasive arguments concerning privilege and consent that the Court need not reach.

**D.      National Origin Discrimination**

The Defendant argues that the Plaintiff waived his national origin claim by failing to respond to the Defendant's arguments against this claim in his brief. (Reply Br. Supp. Mot. Summ. J. 1, ECF No. 60.) The Court agrees. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion."). The Defendant argued in its brief that none of the decision makers were aware of the Plaintiff's national origin. (Def.'s Br. Supp. Mot. Summ. J. 17, ECF No. 56.) Summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004). The Plaintiff's Italian origin is not even mentioned in his brief nor is national origin otherwise presented in support of any allegation of discrimination. The Court will grant summary judgment on the Plaintiff's national origin claim because he did not present evidence supporting it or respond to the Defendant's arguments against this claim in his brief.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 54]. The Court ORDERS the Clerk to ENTER JUDGMENT in favor of the Defendant and against the Plaintiff.

SO ORDERED on March 13, 2012.

s/ Theresa L. Springmann

THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION